UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       *Plaintiff*,<br><br>       v.<br><br>REGAL CINEMAS, INC.,<br><br>and<br><br>CONSOLIDATED THEATRES HOLDINGS, GP,<br><br>       *Defendants*. | Civil Action No:<br><br>Judge:<br><br>Filed: |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil antitrust action to enjoin the proposed merger of Regal Cinemas, Inc. and Consolidated Theatres, GP, and to obtain equitable relief. If the merger is permitted to proceed, it would combine the two leading, and in some cases only, operators of first-run, commercial movie theatres in parts of the metropolitan areas of Charlotte, Raleigh, and Asheville, North Carolina. The merger would substantially lessen competition and tend to create a monopoly in the theatrical exhibition of commercial, first-run movies in the above listed markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

1

## I. JURISDICTION AND VENUE

1.    This action is filed by the United States pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to obtain equitable relief and to prevent a violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

2.    One defendant operates theatres in this District; the other attracts patrons from and advertises in this District.  In addition, the distribution and exhibition of commercial, first-run films is a commercial activity that substantially affects, and is in the flow of, interstate trade and commerce.  Defendant's activities in purchasing equipment, services, and supplies as well as licensing films for exhibitors substantially affect interstate commerce.  The Court has jurisdiction over the subject matter of this action and jurisdiction over the parties pursuant to 15 U.S.C. §§ 22, 25, and 26, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

3.    Venue in this District is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(c).  In addition, defendants have consented to venue and personal jurisdiction in this judicial district.

## II. DEFENDANTS AND THE PROPOSED MERGER

4.    Regal Cinemas, Inc. ("Regal") is a Tennessee corporation with its headquarters in Knoxville.  Regal operates more than 6,400 screens at approximately 540 theatres in 39 states and the District of Columbia under the Regal, United Artists, Edwards, and Hoyts names.

5.    Consolidated Theatres Holdings, GP, is a North Carolina partnership (hereinafter referred to as "Consolidated").  Consolidated operates 400 screens at 28 theatres in Georgia, Maryland, North Carolina, South Carolina, Tennessee, and Virginia, with additional theatres projected to open in the next few years, including the Biltmore Grande 15, which is scheduled to open in Asheville, North Carolina in August 2008.

6.    On January 14, 2008, Regal and Consolidated signed a purchase and sale agreement.  The deal is structured as an asset purchase, with Regal acquiring Consolidated for approximately $210 million.

### III.  BACKGROUND OF THE MOVIE INDUSTRY

7.    Theatrical exhibition of feature length motion picture films ("movies") provides a major source of out-of-home entertainment in the United States.  Although they vary, ticket prices for movies tend to be significantly less expensive than many other forms of out-of-home entertainment, particularly live entertainment such as sporting events and live theatre.

8.    Viewing movies in the theatre is a very popular pastime.  Over 1.4 billion movie tickets were sold in the United States in 2007, with total box office revenue exceeding $9.7 billion.

9.    Companies that operate movie theatres are called "exhibitors."  Some exhibitors own a single theatre, whereas others own a circuit of theatres within one or more regions of the United States.  Established exhibitors include AMC, Carmike, and Cinemark, as well as Regal and Consolidated.

10.    Exhibitors set ticket prices for each theatre based on a number of factors, including the competitive situation facing each theatre, the age of the theatres, the prices of nearby, comparable theatres, the population demographics and density surrounding the theatre, and the number and type of amenities each theatre offers, such as stadium seating.

## IV.  RELEVANT MARKET

### A.  Product Market

11.    Movies are a unique form of entertainment.  The experience of viewing a movie in a theatre is an inherently different experience from live entertainment (*e.g.*, a stage production), a sporting event, or viewing a movie in the home (*e.g.*, on a DVD or via pay-per view).

12.    Typically, viewing a movie at home lacks several characteristics of viewing a movie in a theatre, including the size of screen, the sophistication of sound systems, and the social experience of viewing a movie with other patrons.  Additionally, the most popular, newly released or "first-run" movies are not available for home viewing.  Movies are considered to be in their "first-run" during the four to five weeks following initial release in a given locality.  If successful, a movie may be exhibited at other theatres after the first-run as part of a second or subsequent run (often called a sub-run).

13.    Reflecting the significant differences of viewing a movie in a theatre, ticket prices for movies are generally very different from prices for other forms of entertainment:  live entertainment is typically significantly more expensive than a movie ticket, whereas renting a DVD for home viewing is usually significantly cheaper than viewing a movie in a theatre.  Going to the movies is a different experience from other forms of entertainment, and a small but significant post-acquisition increase in ticket prices, or reduction in discounts, for first-run commercial movies would not cause a sufficient number of customers to shift to other forms of entertainment to make such a price increase unprofitable.

14.    Reflecting the significant difference between viewing a newly-released, first-run movie and an older sub-run movie, tickets at theatres exhibiting first-run movies usually cost

4

significantly more than tickets at sub-run theatres.  Movies exhibited at sub-run theatres are no

longer new releases, and moviegoers generally do not regard sub-run movies as an adequate

substitute for first-run movies and a small but significant post-acquisition increase in ticket

prices, or reduction in discounts, for first-run commercial movies would not cause a sufficient

number of customers to switch to theatres exhibiting sub-run movies to make such a price

increase unprofitable.

15.    Art movies and foreign language movies are also not substitutes for commercial,

first-run movies.  Although art and foreign language movies appeal to some viewers of

commercial movies, potential audience and demand conditions are quite distinct.  For

example, art movies tend to appeal more universally to mature audiences and art movie

patrons tend to purchase fewer concessions.  Exhibitors consider art theatre operations as

distinct from the operations of theatres that exhibit commercial movies.  Theatres that

primarily exhibit art movies often contain auditoriums with fewer seats than theatres that

primarily play commercial movies.  Typically, art movies are released less widely than

commercial movies.  A small but significant post-acquisition increase in ticket prices, or

reduction in discounts, for first-run commercial movies would not cause a sufficient number of

customers to switch to theatres exhibiting art movies to make such a price increase unprofitable.

16.    Similarly, foreign language movies do not widely appeal to U.S. audiences.  As a

result, moviegoers do not regard foreign language movies as adequate substitutes for first-run,

commercial movies.  A small but significant post-acquisition increase in ticket prices, or

reduction in discounts, for first-run movies would not cause a sufficient number of customers to

switch to theatres exhibiting foreign language movies to make such a price increase unprofitable.

17.   The relevant product market within which to assess the competitive effects of this merger is the exhibition of first-run, commercial movies.

*B. Geographic Markets*

18.   Data show that moviegoers typically are not willing to travel very far from their homes to attend a movie. As a result, geographic markets for the exhibition of first-run, commercial movies are relatively local.

Charlotte, North Carolina Area

19.   Regal and Consolidated account for the vast majority of first-run movie tickets sold in southern Charlotte, North Carolina ("Southern Charlotte"), an area which encompasses Consolidated's Philips 10 theatre, Consolidated's Arboretum 12, Regal's Crown Point 12 and Regal's Stonecrest 22 theatre. In this area, the only other theatres showing first-run, commercial movies are an independent five-plex stadium theatre and the AMC Carolina Pavilion 22, a stadium theatre.

20.   Moviegoers who reside in Southern Charlotte are reluctant to travel significant distances out of that area to attend a movie except in unusual circumstances. A small but significant increase in the price of movie tickets in Southern Charlotte would not cause a sufficient number of moviegoers to travel out of Southern Charlotte to make the increase unprofitable. Southern Charlotte constitutes a relevant geographic market in which to assess the competitive effects of this merger.

Raleigh, North Carolina Area

21.   Regal and Consolidated account for the vast majority of first-run movie tickets sold in Northern Raleigh, North Carolina ("Northern Raleigh"), which encompasses Regal's Brier Creek

14, Regal's North Hills 14, and Consolidated's Raleigh Grand.  The only other theatres showing first-run, commercial movies in the Northern Raleigh area are the sloped-floor, six screen Six Forks and the 15-screen Carmike theatre with stadium seating.

22.    Moviegoers who reside in Northern Raleigh are reluctant to travel significant distances out of their area to attend a movie except in unusual circumstances.  A small but significant increase in the price of movie tickets in either Northern Raleigh would not cause sufficient number of moviegoers to travel out of Northern Raleigh to make the increase unprofitable.  Northern Raleigh constitutes a relevant geographic market in which to assess the competitive effects of this merger.

23.    Regal and Consolidated account for all of the first-run movie tickets sold in the suburb of Garner to the south of  Raleigh, North Carolina ("Southern Raleigh"), which encompasses Regal's Garner Towne Square 10 and Consolidated's White Oak 14.  There are no other theatres showing first-run, commercial movies in Southern Raleigh.

24.    Moviegoers who reside in Southern Raleigh are reluctant to travel significant distances out of their area to attend a movie except in unusual circumstances.  A small but significant increase in the price of movie tickets in either Southern Raleigh would not cause sufficient number of moviegoers to travel out of Southern Raleigh to make the increase unprofitable.  Southern Raleigh constitutes a relevant geographic market in which to assess the competitive effects of this merger.

Asheville, North Carolina Area

25.    After the completion of Consolidated's Biltmore Grande 15 around August 2008, Regal and Consolidated will likely account for the vast majority of first-run movie tickets sold in

Asheville, North Carolina area ("Asheville"), which encompasses the area around Regal's

Hollywood 14 and the developing site of Consolidated's Biltmore Grande 15.  There are only two

other non-Regal theatres showing first-run, commercial movies in Asheville -- a Carmike theatre

with 10 screens and a Fine Arts theatre with two screens.

26.    Moviegoers in Asheville are reluctant to travel significant distances out of that area to

attend a movie except in unusual circumstances.  A small but significant increase in the price of

movie tickets in Asheville would not cause a sufficient number of moviegoers to travel out of

Asheville to make the increase unprofitable.  Asheville constitutes a relevant geographic market in

which to assess the competitive effects of this merger.

27.    The exhibition of first-run, commercial movies in Southern Charlotte, Northern

Raleigh, Southern Raleigh and Asheville each constitutes a relevant market (*i.e.*, a line of

commerce and a section of the country) within the meaning of Section 7 of the Clayton Act, 15

U.S.C. § 18.

## V.  COMPETITIVE EFFECTS

28.    Exhibitors compete on multiple dimensions to attract moviegoers to their theatres

over the theatres of their rivals.  They compete over the quality of the viewing experience.  They

compete to offer the most sophisticated sound systems, best picture clarity, nicest seats with best

views, and cleanest floors and lobbies for moviegoers.  And, to gain market share, exhibitors seek

to license the first-run movies that are likely to attract the largest numbers of moviegoers.

Exhibitors also compete on price, knowing that if they charge too much (or do not offer sufficient

discounted tickets for matinees, seniors, children, etc.), moviegoers will begin to frequent their

rivals.

29.    In the geographic markets of Southern Charlotte, Northern and Southern Raleigh, and Asheville, Regal and Consolidated compete head-to-head for moviegoers. These geographic markets are very concentrated and in each market, Regal and Consolidated are the other's most significant competitor given their close proximity to one another and to local moviegoers, and from the perspective of such moviegoers, the relative inferiority in terms of location, size or quality of other theatres in the geographic markets. Their rivalry spurs each to improve the quality of the viewing experience and keeps prices in check.

30.    In Southern Charlotte, the proposed merger would give the newly merged entity control of four of the six first-run, commercial theatres in that area, with 56 out of 83 total screens and a 75% share of 2007 box office revenues, which totaled approximately $17.1 million. Using a measure of market concentration called the Herfindahl-Hirschman Index ("HHI"), explained in Appendix A, the merger would yield a post-merger HHI of approximately 6,058, representing an increase of roughly 2,535 points.

31.    In Northern Raleigh, the proposed merger would give the newly merged entity control of three of the five first-run, commercial theatres in that area, with 44 of 65 total screens and 79% of 2007 box office revenues, which totaled approximately $11.6 million. The merger would yield a post-merger HHI of roughly 6,523, representing an increase of around 2,315 points.

32.    In Southern Raleigh, the proposed merger would give the newly merged entity control of the only two theatres in this area. Therefore, the market share of the combined entity would be 100% of screens and 100% of 2007 box office revenues, which totaled $3.5 million. The merger would yield the highest post-merger HHI number possible – 10,000, representing an increase of 3,167 points.

33.    In Asheville, after the completion of the Biltmore Grand 15, the proposed merger would give the newly merged entity control of four of the six first-run, commercial theatres with 41 of 53 total screens.  As measured by total screens only (since Consolidated does not yet have box office revenues in Asheville), the combined entity would have a market share of approximately 77% in Asheville.  The merger would yield a post-merger HHI of roughly 6,355, representing an increase of 2,777 points.

34.    Today, were Regal or Consolidated to increase ticket prices in any of the four geographic markets at issue and the other were not to follow, the exhibitor that increased price would likely suffer financially as a substantial number of its patrons would patronize the other exhibitor.  After the merger, the newly combined entity would re-capture such losses, making price increases profitable that would have been unprofitable pre-merger.  Thus, the merger is likely to lead to higher ticket prices for moviegoers, which could take the form of a higher adult evening ticket price or reduced discounting, *e.g.*, for matinees, children, seniors, and students.

35.    The proposed merger would also eliminate competition between Regal and Consolidated over the quality of the viewing experience in each of the geographic markets at issue.  If no longer required to compete, Regal and Consolidated would have reduced incentives to maintain, upgrade, and renovate their theatres in the relevant markets, to improve those theatres' amenities and services, and to license the highest revenue movies, thus reducing the quality of the viewing experience for a moviegoer.

36.    The presence of the other theatres offering first-run, commercial movies in certain of the relevant geographic markets would be insufficient to replace the competition lost due to the merger, and thus render unprofitable post-merger increases in ticket prices or decreases in quality

by the newly merged entity. For various reasons, the other theatres in the relevant geographic markets offer less attractive options for the moviegoers that are served by the Regal and Consolidated theatres. For example, they are located further away from these moviegoers than are the Regal and Consolidated theatres, they are a relatively smaller size or have fewer screens than the Regal and Consolidated theatres, or they offer a lower quality viewing experience than do the Regal and Consolidated theatres.

## VI. ENTRY

37.    The entry of a first run, commercial movie theatre is unlikely in all of the relevant markets. Exhibitors are reluctant to locate new theatres near existing theatres unless the population density and demographics makes new entry viable or the existing theatres do not have stadium seating. That is not the case here. Over the next two years, the demand for more movie theatres in the areas at issue is not likely to support entry of a new theatre. And all of these markets have or will soon have theatres with stadium seating. Thus, no new first-run, commercial theatres with the capability to reduce significantly the newly merged entity's market power are likely to open within the next two years in Southern Charlotte, Northern Raleigh, Southern Raleigh, or Asheville in response to an increase in movie ticket prices or a decline in theatre quality.

## VII. VIOLATION ALLEGED

38.    The United States hereby reincorporates paragraphs 1 through 37.

39.    The effect of the proposed merger would be to lessen competition substantially in Southern Charlotte, Northern Raleigh, Southern Raleigh and Asheville in violation of Section 7 of the Clayton Act, 15 U.S.C. 18.

40.    The transaction would likely have the following effects, among others:  (a) prices

11

for first-run, commercial movie tickets would likely increase to levels above those that would prevail absent the merger, and (b) quality of theatres and the theatre viewing experience in the geographic area would likely decrease absent the merger.

## VIII.  REQUESTED RELIEF

41.    The plaintiffs request: (a) adjudication that the proposed merger would violate Section 7 of the Clayton Act; (b) permanent injunctive relief to prevent the consummation of the proposed merger and to prevent the defendants from entering into or carrying out any agreement, understanding or plan, the effect of which would be to combine the businesses or assets of defendants; (c) an award of the plaintiff of its costs in this action; and (d) such other relief as is proper.

DATED:  April 29, 2008


FOR PLAINTIFF UNITED STATES OF AMERICA


DAVID L. MEYER
(DC Bar No. 414420)
Acting Assistant Attorney General
Antitrust Division


PATRICIA A. BRINK
Deputy Director of Operations


JOHN R. READ          by NBH
Chief, Litigation III


NINA B. HALE
Assistant Chief, Litigation III


GREGG I. MALAWER
(DC Bar No. 481685)
JENNIFER WAMSLEY
(DC Bar No. 486540)
ANNE NEWTON MCFADDEN


Attorneys for the United States
United States Department of Justice
Antitrust Division
450 5th Street, N.W.
Suite 4000
Washington, DC 20530


13

<u>EXHIBIT A</u>
<u>DEFINITION OF HHI AND</u>
<u>CALCULATIONS FOR MARKET</u>

"HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of thirty, thirty, twenty and twenty percent, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$). The HHI takes into account the relative size and distribution of the firms in a market and approaches zero when a market consists of a large number of firms of relatively equal size. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated, and those in which the HHI is in excess of 1800 points are considered to be concentrated. Transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the Merger Guidelines. See *Merger Guidelines* § 1.51.

14

JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA | REGAL CINEMAS, INC. CONSOLIDATED THEATRES HOLDINGS, GP |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **(EXCEPT IN U.S. PLAINTIFF CASES)** | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT **(IN U.S. PLAINTIFF CASES ONLY)** ___37918___ NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Gregg I. Malawer Jennifer Wamsley Anne Newton McFadden United States Department of Justice Antitrust Division, Litigation III Section 450 5th Street NW, Suite 4000 Washington, DC 20530 (202)616-5943 | A. Douglas Melamed     Marimichael Skubel Jeffrey Ayer     Julie Brennan Jacobs Wilmer Cutler Pickering Hale and Dorr LLP    Kirkland & Ellis LLP 1875 Pennsylvania Avenue, NW     655 Fifteenth Street, NW Washington, DC 20006     Washington, DC 20005 Tel: 202-663-6088     Tel: 202-879-5111 |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- (●) 1 U.S. Government Plaintiff
- ( ) 3 Federal Question (U.S. Government Not a Party)
- ( ) 2 U.S. Government Defendant
- ( ) 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ( ) 1 | ( ) 1 | Incorporated or Principal Place of Business in This State | ( ) 4 | ( ) 4 |
| Citizen of Another State | ( ) 2 | ( ) 2 | Incorporated and Principal Place of Business in Another State | ( ) 5 | ( ) 5 |
| Citizen or Subject of a Foreign Country | ( ) 3 | ( ) 3 | Foreign Nation | ( ) 6 | ( ) 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

| (●) A. *Antitrust* | ( ) B. *Personal Injury/ Malpractice* | ( ) C. *Administrative Agency Review* | ( ) D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| [X] 410 Antitrust | ☐ 310 Airplane ☐ 315 Airplane Product Liability ☐ 320 Assault, Libel & Slander ☐ 330 Federal Employers Liability ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability ☐ 360 Other Personal Injury ☐ 362 Medical Malpractice ☐ 365 Product Liability ☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act **Social Security:** ☐ 861 HIA ((1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g) **Other Statutes** ☐ 891 Agricultural Acts ☐ 892 Economic Stabilization Act ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act ☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment. *(If Antitrust, then A governs)* |

| ( ) E. *General Civil (Other)* | OR | ( ) F. *Pro Se General Civil* | | |
|---|---|---|---|---|
| **Real Property** ☐ 210 Land Condemnation ☐ 220 Foreclosure ☐ 230 Rent, Lease & Ejectment ☐ 240 Torts to Land ☐ 245 Tort Product Liability ☐ 290 All Other Real Property **Personal Property** ☐ 370 Other Fraud ☐ 371 Truth in Lending ☐ 380 Other Personal Property Damage ☐ 385 Property Damage Product Liability | **Bankruptcy** ☐ 422 Appeal 28 USC 158 ☐ 423 Withdrawal 28 USC 157 **Prisoner Petitions** ☐ 535 Death Penalty ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition **Property Rights** ☐ 820 Copyrights ☐ 830 Patent ☐ 840 Trademark **Federal Tax Suits** ☐ 870 Taxes (US plaintiff or defendant ☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty** ☐ 610 Agriculture ☐ 620 Other Food &Drug ☐ 625 Drug Related Seizure of Property 21 USC 881 ☐ 630 Liquor Laws ☐ 640 RR & Truck ☐ 650 Airline Regs ☐ 660 Occupational Safety/Health ☐ 690 Other **Other Statutes** ☐ 400 State Reapportionment ☐ 430 Banks & Banking ☐ 450 Commerce/ICC Rates/etc. ☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations ☐ 480 Consumer Credit ☐ 490 Cable/Satellite TV ☐ 810 Selective Service ☐ 850 Securities/Commodities/ Exchange ☐ 875 Customer Challenge 12 USC 3410 ☐ 900 Appeal of fee determination under equal access to Justice ☐ 950 Constitutionality of State Statutes ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act | |

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Section 7 of the Clayton Act, as amended 15 U.S.C. § 18

**VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 | **DEMAND $** [_____] Check YES only if demanded in complaint
**JURY DEMAND:** YES ☐ NO ☐

**VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐ | NO ☐ | If yes, please complete related case form.

DATE 4/29/08     SIGNATURE OF ATTORNEY OF RECORD  *Gregg Malawer*

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2008, I caused a copy of the foregoing Complaint, proposed Final Judgment, Competitive Impact Statement, Hold Separate Stipulation and Order, and Explanation of Consent Decree Procedures to be served on the defendants in this matter in the manner set forth below:

By electronic mail and certified mail:

Counsel for Defendant Regal Cinemas, Inc.
A. Douglas Melamed
Jeffrey Ayer
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: 202-663-6088
Fax: 202-663-6363
Email: jeffrey.ayer@wilmerhale.com

Counsel for Defendant Consolidated Theatres Holdings, GP
Marimichael Skubel
Julie Brennan Jacobs
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Tel: 202-879-5111
Fax: 202-879-5200
Email: jbjacobs@kirkland.com

Gregg I. Malawer (D.C. Bar No. 481685)
United States Department of Justice
Antitrust Division, Litigation III Section
450 5th Street., N.W., Suite 4000
Washington, DC 20530
Tel: (202) 616-5943
Fax: (202) 307-9952
Email: gregg.malawer@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | Civil Action No: |
| v. ) | |
| ) | Judge: |
| REGAL CINEMAS, INC., ) | |
| ) | Filed: |
| and ) | |
| ) | |
| CONSOLIDATED THEATRES HOLDINGS, GP, ) | |
| ) | |
| *Defendants*. ) | |
| ) | |

## HOLD SEPARATE STIPULATION AND ORDER

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

### I. Definitions

As used in this Hold Separate Stipulation and Order:

A.    "Acquirer" or "Acquirers" means the entity or entities to whom Regal or Consolidated divest the Theatre Assets.

B.    "Regal" means defendant Regal Cinemas, Inc., a Tennessee corporation with its headquarters in Knoxville, Tennessee, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

C.    "Consolidated" means defendant Consolidated Theatres Holdings, GP, a North

Carolina Partnership, its successors and assigns, and its subsidiaries, divisions, groups, affiliates,

partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

D.    "Theatre Assets" means the first-run, commercial motion picture theatre

businesses operated by Regal or Consolidated, under the following names and at the following

locations:

|      | Theatre Name     | Theatre Address                            |
|------|------------------|--------------------------------------------|
| i.   | Crown Point 12   | 9630 Monroe Road, Charlotte, NC 28270      |
| ii.  | Raleigh Grand 16 | 4840 Grove Barton Road, Raleigh, NC 27613  |
| iii. | Town Square 10   | 2600 Timber Dr Garner, NC 27529            |
| iv.  | Hollywood 14     | 1640 Hendersonville Rd, Asheville, NC 28803|

and includes:

1. All tangible assets that comprise the first-run, commercial motion picture theatre

business including all equipment, fixed assets and fixtures, personal property, inventory, office

furniture, materials, supplies, and other tangible property and all assets used in connection with

the Theatre Assets; all licenses, permits and authorizations issued by any governmental

organization relating to the Theatre Assets; all contracts, teaming arrangements, agreements,

leases, commitments, certifications, and understandings, relating to the Theatre Assets, including

supply agreements; all customer lists, contracts, accounts, and credit records; all repair and

performance records and all other records relating to the Theatre Assets;

-2-

2. All intangible assets used in the development, production, servicing and sale of Theatre Assets, including, but not limited to all patents, licenses and sublicenses, intellectual property, technical information, computer software (except Defendants' proprietary software) and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, all manuals and technical information Defendants provide to their own employees, customers, suppliers, agents or licensees, and all research data concerning historic and current research and development efforts relating to the Theatre Assets. Provided, however, that this term does not include any right to use or interests in defendants' trademarks, trade names, service marks or service names, or copyrighted advertising materials.

## II. Objectives

The Final Judgment filed in this case is meant to ensure Defendants' prompt divestiture of the Theatre Assets for the purpose of establishing one or more viable competitors in the exhibition of first-run, commercial motion pictures in order to remedy the effects that the United States alleges would otherwise result from Regal's acquisition of Consolidated. This Hold Separate Stipulation and Order ensures, prior to such divestitures, that the Theatre Assets remain economically viable, and ongoing business concerns, and that competition is maintained and not diminished during the pendency of the ordered divestitures.

### III. Jurisdiction

The Court has jurisdiction over the subject matter of this action and over each of the parties hereto, and venue of this action is proper in the United States District Court for the District of Columbia.

### IV. Compliance with and Entry of Final Judgment

A.    The parties stipulate that a Final Judgment in the form attached hereto as Exhibit A, may be filed with and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, and without further notice to any party or other proceedings, provided that the United States has not withdrawn its consent, which it may do at any time before the entry of the proposed Final Judgment by serving notice thereof on Defendants and by filing that notice with the Court.

B.    Defendants shall abide by and comply with the provisions of the proposed Final Judgment, pending the Judgment's entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the signing of this Stipulation by the parties, comply with all the terms and provisions of the proposed Final Judgment as though the same were in full force and effect as an order of the Court.

C.    Defendants shall not consummate the transaction sought to be enjoined by the Complaint herein before the Court has signed this Hold Separate Stipulation and Order.

D.    This Stipulation shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

-4-

E.    In the event that (1) the United States has withdrawn its consent, as provided in

Section IV(A) above, or (2) the proposed Final Judgment is not entered pursuant to this

Stipulation, the time has expired for all appeals of any Court ruling declining entry of the

proposed Final Judgment, and the Court has not otherwise ordered continued compliance with

the terms and provisions of the proposed Final Judgment, then the parties are released from all

further obligations under this Stipulation, and the making of this Stipulation shall be without

prejudice to any party in this or any other proceeding.

F.    Defendants represent that the divestitures ordered in the proposed Final Judgment

can and will be made, and that Defendants will later raise no claim of mistake, hardship, or

difficulty of compliance as grounds for asking the Court to modify any of the provisions

contained therein.

## V.  Hold Separate Provisions

Until the divestitures required by the Final Judgment have been accomplished:

A.    Defendants shall, except as is necessary to carry out their obligations under this

Hold Separate Stipulation and Order and the proposed Final Judgment, or to comply with other

legal obligations, take all steps necessary to ensure that the Theatre Assets will be maintained and

operated as ongoing, economically viable and active competitors in the exhibition of first-run,

commercial motion pictures.  Defendants shall maintain the viability, marketability, and

competiveness of the Theatre Assets, and shall not cause the wasting or deterioration of the

Theatre Assets, nor shall they cause the Theatre Assets to be operated in a manner inconsistent

with applicable laws, nor shall they sell, transfer, encumber, or otherwise impair the viability,

marketability or competitiveness of the Theatre Assets.  Defendants shall conduct the business of

-5-

the Theatre Assets in the regular and ordinary course and in accordance with past practice, except

as otherwise approved by the United States, and shall use their best efforts to preserve the

existing relationships with suppliers, customers, employees, and others having business relations

with the Theatre Assets. Defendants shall use their best efforts to keep the organization and

properties of each of the Theatre Assets intact, including current business operations, physical

facilities, and working conditions. Within twenty (20) days after the entry of the Hold Separate

Stipulation and Order, the Defendants will inform the United States of the steps taken to comply

with the Hold Separate Stipulation and Order.

     B.     Defendants shall use all reasonable efforts to maintain and increase the sales and

revenues of the Theatre Assets, and shall maintain at 2008 or previously approved levels for

2009, whichever are higher, all promotional, advertising, sales, technical assistance, marketing,

and merchandising support for the Theatre Assets. Provided, however, that Defendants are not

obligated to maintain movie-specific promotions at any particular level.

     C.     Defendants shall provide sufficient working capital and lines and sources of credit

to continue to maintain the Theatre Assets as economically viable and competitive, ongoing

businesses, consistent with the requirements of Sections V(A) and (B).

     D.     Defendants shall take all steps necessary to ensure that the Theatre Assets are fully

maintained in operable condition at no less than their current capacity and sales, and shall

maintain and adhere to normal product and service improvement, upgrade, repair, and

maintenance schedules for the Theatre Assets.

E.    Defendants shall not, except as part of a divestiture approved by the United States in accordance with the terms of the proposed Final Judgment, remove, sell, lease, assign, transfer, pledge, or otherwise dispose of any of the Theatre Assets.

F.    Defendants shall maintain, in accordance with sound accounting principles, separate, accurate and complete financial ledgers, books, and records that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues, and income of the Theatre Assets.

G.    Defendants shall take no action that would jeopardize, delay, or impede the sale of the Theatre Assets.

H.    Defendants' employees with primary responsibility for the operation of the Theatre Assets shall not be transferred or reassigned to other areas within the company except for transfer bids initiated by employees pursuant to Defendants' regular, established job posting policy. Defendants shall provide the United States with ten (10) calendar days notice of such transfer.

I.    Defendants shall appoint a person or persons to oversee the Theatre Assets, and who will be responsible for Defendants' compliance with this Section. This person or persons shall have complete managerial responsibility for the Theatre Assets, subject to the provisions of this Final Judgment, and shall make all pricing and discounting decisions independent of Defendants. In the event such person is unable to perform his duties Defendants shall appoint, subject to the approval of the United States, a replacement within ten (10) working days. Should Defendants fail to appoint a replacement acceptable to the United States within this time period, the United States shall appoint a replacement.

-7-

J.    Defendants shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to complete the divestitures pursuant to the Final Judgment to an Acquirer or Acquirers acceptable to the United States.

K.    This Hold Separate Stipulation and Order shall remain in effect until consummation of the divestitures required by the proposed Final Judgment or until further order of the Court.

## ORDER

It is SO ORDERED this ___ day of _____ 2008.


_____
**United States District Judge**

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES**
**OF AMERICA:**

_Gregg Malawer_
_____
Gregg I. Malawer (DC Bar No. 481685)
Jennifer A. Wamsley (DC Bar No. 486540)
Anne Newton McFadden
U.S. Department of Justice
Antitrust Division
450 5th Street., N.W.
Suite 4000
Washington, DC 20530
(202) 616-5943
Attorneys for Plaintiff the United States

Dated: 4/29/08

**FOR DEFENDANT CONSOLIDATED:**

_____
Marimichael Skubel
Julie Brennan Jacobs
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Tel: 202-879-5111
Fax: 202-879-5200

**FOR DEFENDANT REGAL:**

_____
A. Douglas Melamed
Jeffrey Ayer
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: 202-663-6088
Fax: 202-663-6363

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES**
**OF AMERICA:**

_____
Gregg I. Malawer (DC Bar No. 481685)
Jennifer A. Wamsley (DC Bar No. 486540)
Anne Newton McFadden
U.S. Department of Justice
Antitrust Division
450 5th Street., N.W.
Suite 4000
Washington, DC 20530
(202) 616-5943
Attorneys for Plaintiff the United States

Dated:

**FOR DEFENDANT CONSOLIDATED:**

Marimichael Skubel
Julie Brennan Jacobs
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Tel: 202-879-5111
Fax: 202-879-5200

**FOR DEFENDANT REGAL:**

_____
A. Douglas Melamed
Jeffrey Ayer
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: 202-663-6088
Fax: 202-663-6363

-9-

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES**
**OF AMERICA:**

**FOR DEFENDANT CONSOLIDATED:**

_____
Marimichael Skubel
Julie Brennan Jacobs
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Tel: 202-879-5111
Fax: 202-879-5200

_____
Gregg I. Malawer (DC Bar No. 481685)
Jennifer A. Wamsley (DC Bar No. 486540)
Anne Newton McFadden
U.S. Department of Justice
Antitrust Division
450 5th Street., N.W.
Suite 4000
Washington, DC 20530
(202) 616-5943
Attorneys for Plaintiff the United States

Dated:

**FOR DEFENDANT REGAL:**

_____
A. Douglas Melamed
Jeffrey Ayer
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: 202-663-6088
Fax: 202-663-6363

-9-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>*Plaintiff*, )<br><br>v. )<br><br>REGAL CINEMAS, INC., )<br><br>and )<br><br>CONSOLIDATED THEATRES HOLDINGS, GP )<br><br>*Defendants*. )<br>) | Civil Action No:<br><br>Judge:<br><br>Filed: |

---

## **FINAL JUDGMENT**

WHEREAS, Plaintiff, United States of America filed its Complaint on April 29, 2008, the United States and Defendants, Regal Cinemas, Inc. ("Regal") and Consolidated Theatres Holdings, GP ("Consolidated"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by the Defendants to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires Defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants have represented to the United States that the divestitures required below can and will be made and that Defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. **Jurisdiction**

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II. **Definitions**

As used in this Final Judgment:

A.    "Acquirer" or "Acquirers" means the entity or entities to whom Defendants divest the Theatre Assets.

B.    "Regal" means Defendant Regal Cinemas Inc., a Tennessee corporation with its headquarters in Knoxville, Tennessee, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

-2-

C.    "Consolidated" means defendant Consolidated Theatres Holdings, GP, a North Carolina Partnership, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

D.    "Landlord Consent" means any contractual approval or consent that the landlord or owner of one or more of the Theatre Assets, or the property on which one or more of the Theatre Assets is situated, must grant prior to the transfer of one of the Theatre Assets to an Acquirer.

E.    "Theatre Assets" means the first-run, commercial motion picture theatre businesses operated by Regal or Consolidated, under the following names and at the following locations:

|      | Theatre Name | Theatre Address |
|------|--------------|-----------------|
| i.   | Crown Point 12 | 9630 Monroe Road, Charlotte, NC 28270 |
| ii.  | Raleigh Grand 16 | 4840 Grove Barton Road, Raleigh, NC 27613 |
| iii. | Town Square 10 | 2600 Timber Dr Garner, NC 27529 |
| iv.  | Hollywood 14 | 1640 Hendersonville Rd, Asheville, NC 28803 |

The term "Theatre Assets" includes:

1. All tangible assets that comprise the first-run, commercial motion picture theatre business including all equipment, fixed assets and fixtures, personal property, inventory, office furniture, materials, supplies, and other tangible property and all assets used in connection with the Theatre Assets; all licenses, permits and authorizations issued by any governmental

organization relating to the Theatre Assets; all contracts, teaming arrangements, agreements,

leases, commitments, certifications, and understandings, relating to the Theatre Assets, including

supply agreements; all customer lists, contracts, accounts, and credit records; all repair and

performance records and all other records relating to the Theatre Assets;

        2. All intangible assets used in the development, production, servicing and sale of

Theatre Assets, including, but not limited to all patents, licenses and sublicenses, intellectual

property, technical information, computer software (except defendants' proprietary software) and

related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols,

specifications for materials, specifications for parts and devices, safety procedures for the

handling of materials and substances, quality assurance and control procedures, design tools and

simulation capability, all manuals and technical information Defendants provide to their own

employees, customers, suppliers, agents or licensees, and all research data concerning historic

and current research and development efforts relating to the Theatre Assets.  Provided, however,

that this term does not include any right to use or interests in defendants' trademarks, trade

names, service marks or service names, or copyrighted advertising materials.

### III.  <u>Applicability</u>

    A.    This Final Judgment applies to Regal and Consolidated, as defined above, and all

other persons in active concert or participation with any of them who receive actual notice of this

Final Judgment by personal service or otherwise.

    B.    If, prior to complying with Section IV and V of this Final Judgment, Defendants

sell or otherwise dispose of all or substantially all of their assets or of lesser business units that

include the Theatre Assets, they shall require the purchaser to be bound by the provisions of this

Final Judgment.  Defendants need not obtain such an agreement from the acquirers of the assets divested pursuant to this Final Judgment.

## IV. Divestitures

A.       Defendants are ordered and directed, within ninety (90) calendar days after the filing of the Complaint in this matter, or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later, to divest the Theatre Assets in a manner consistent with this Final Judgment to an Acquirer(s) acceptable to the United States in its sole discretion.  The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed ninety (90) calendar days in total, and shall notify the Court in such circumstances.  Defendants agree to use their best efforts to divest the Theatre Assets as expeditiously as possible.

B.       In accomplishing the divestitures ordered by this Final Judgment, Defendants promptly shall make known, by usual and customary means, the availability of the Theatre Assets.  Defendants shall inform any person making inquiry regarding a possible purchase of the Theatre Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment.  Defendants shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Theatre Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client privilege or work-product doctrine.  Defendants shall make available such information to the United States at the same time that such information is made available to any other person.

C.    Defendants shall provide the Acquirers and the United States information relating to the personnel involved in the operation of the Theatre Assets to enable the Acquirers to make offers of employment. Defendants will not interfere with any negotiations by the Acquirers to employ any Defendant employee whose primary responsibility is the operation of the Theatre Assets.

D.    Defendants shall permit prospective Acquirers of the Theatre Assets to have reasonable access to personnel and to make inspections of the physical facilities of the Theatre Assets; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

E.    Defendants shall warrant to all Acquirers of the Theatre Assets that each asset will be operational on the date of sale.

F.    Defendants shall not take any action that will impede in any way the permitting, operation, or divestitures of the Theatre Assets. At the option of the Acquirers, Defendants shall enter into an agreement for products and services, such as computer support services, that are reasonably necessary for the Acquirer(s) to effectively operate the Theatre Assets during a transition period. The terms and conditions of any contractual arrangements meant to satisfy this provision must be commercially reasonable for those products and services for which the agreement is entered and shall remain in effect for no more than three months, absent approval of the United States, in its sole discretion.

G.    Defendants shall warrant to the Acquirers that there are no material defects in the environmental, zoning or other permits pertaining to the operation of each asset, and that

following the sale of the Theatre Assets, Defendants will not undertake, directly or indirectly, any

challenges to the environmental, zoning, or other permits relating to the operation of the Theatre

Assets.

       H.      Unless the United States otherwise consents in writing, the divestitures made

pursuant to Section IV, or by trustee appointed pursuant to Section V, of this Final Judgment,

shall include the entire Theatre Assets, and shall be accomplished in such a way as to satisfy the

United States, in its sole discretion that the Theatre Assets can and will be used by the Acquirers

as part of a viable, ongoing business of first-run, commercial motion picture theatres.

Divestitures of the Theatre Assets may be made to one or more Acquirers, provided that in each

instance it is demonstrated to the sole satisfaction of the United States that the Theatre Assets

will remain viable and the divestitures of such assets will remedy the competitive harm alleged in

the Complaint.  The divestitures, whether pursuant to Section IV or Section V of this Final

Judgment,

        (1)    shall be made to an Acquirer(s) that, in the United States's sole
judgment, has the intent and capability (including the necessary
managerial, operational, technical and financial capability) of
competing effectively in the business of  first-run, commercial
motion picture theatres; and

        (2)    shall be accomplished so as to satisfy the United States, in its sole
discretion, that none of the terms of any agreement between an
Acquirer(s) and Defendants give Defendants the ability unreasonably
to raise the Acquirer's costs, to lower the Acquirer's efficiency, or
otherwise to interfere in the ability of the Acquirer(s) to compete
effectively.

## V. **Appointment of Trustee**

A.      If Defendants have not divested the Theatre Assets within the time period

specified in Section IV(A), Defendants shall notify the United States of that fact in writing.

Upon application of the United States, the Court shall appoint a trustee selected by the United

States and approved by the Court to effect the divestitures of the Theatre Assets.

B.      After the appointment of a trustee becomes effective, only the trustee shall have

the right to sell the Theatre Assets.  The trustee shall have the power and authority to accomplish

the divestitures to an Acquirer(s) acceptable to the United States at such price and on such terms

as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections

IV, V, VI, and VII of this Final Judgment, and shall have such other powers as this Court deems

appropriate.  Subject to Section V(D) of this Final Judgment, the trustee may hire at the cost and

expense of Defendants any investment bankers, attorneys, or other agents, who shall be solely

accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the

divestiture.

C.      Defendants shall not object to a sale by the trustee on any ground other than the

trustee's malfeasance.  Any such objections by Defendants must be conveyed in writing to the

United States and the trustee within ten (10) calendar days after the trustee has provided the

notice required under Section VII.

D.      The trustee shall serve at the cost and expense of Defendants, on such terms and

conditions as the United States approves, and shall account for all monies derived from the sale

of the assets sold by the trustee and all costs and expenses so incurred.  After approval by the

Court of the trustee's accounting, including fees for its services and those of any professionals

and agents retained by the trustee, all remaining money shall be paid to Defendants and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Theatre Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestitures and the speed with which it is accomplished, but timeliness is paramount.

E.    Defendants shall use their best efforts to assist the trustee in accomplishing the required divestitures. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and Defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestitures.

F.    After its appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestitures ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Theatre Assets, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Theatre Assets.

G.     If the trustee has not accomplished the divestitures ordered under this Final Judgment within six months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestitures, (2) the reasons, in the trustee's judgment, why the required divestitures have not been accomplished, and (3) the trustee's recommendations.  To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court.  The trustee shall at the same time furnish such report to the United States which shall have the right to make additional recommendations consistent with the purpose of the trust.  The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

## VI. **Landlord Consent**

A.     If Defendants are unable to effect the divestitures required herein due to the inability to obtain the Landlord Consent for any of the Theatre Assets, Defendants shall divest alternative Theatre Assets that compete effectively with the theatre for which the Landlord Consent was not obtained.  The United States shall, in its sole discretion, determine whether such theatre competes effectively with the theatre for which landlord consent was not obtained.

B.     Within five (5) business days following a determination that Landlord Consent cannot be obtained for one of the Theatre Assets, Defendants shall notify the United States and propose an alternative divestiture pursuant to Section VI(A).  The United States shall have then ten (10) business days in which to determine whether such theatre is a suitable alternative

pursuant to Section VI(A).  If the Defendants' selection is deemed not to be a suitable alternative,
the United States shall in its sole discretion select the theatre to be divested.

C.      If the trustee is responsible for effecting the divestitures, it shall notify both the
United States and the Defendants within five (5) business days following a determination that
Landlord Consent can not be obtained for one of the Theatre Assets.  Defendants shall thereafter
have five (5) business days to propose an alternative divestiture pursuant to Section VI(a).  The
United States shall have then ten (10) business days in which to determine whether such theatre
is suitable alternative pursuant to Section VI(A).  If the Defendants' selection is deemed not to be
a suitable competitive alternative, the United States shall in its sole discretion select the theatre to
be divested.

## VII.  Notice of Proposed Divestitures

A.      Within two (2) business days following execution of a definitive divestiture
agreement, Defendants or the trustee, whichever is then responsible for effecting the divestitures
required herein, shall notify the United States of any proposed divestitures required by Sections
IV or V of this Final Judgment.  If the trustee is responsible, it shall similarly notify Defendants.
The notice shall set forth the details of the proposed divestitures and list the name, address, and
telephone number of each person not previously identified who offered or expressed an interest
in or desire to acquire any ownership interest in the Theatre Assets, together with full details of
the same.

B.      Within fifteen (15) calendar days of receipt by the United States of such notice,
the United States may request from Defendants, the proposed Acquirer(s), any other third party,
or the trustee, if applicable, additional information concerning the proposed divestitures, the

proposed Acquirer(s), and any other potential Acquirer.  Defendants and the trustee shall furnish

any additional information requested within fifteen (15) calendar days of the receipt of the

request, unless the parties shall otherwise agree.

        C.     Within thirty (30) calendar days after receipt of the notice or within twenty (20)

calendar days after the United States has been provided the additional information requested

from Defendants, the proposed Acquirer(s), any third party, and the trustee, whichever is later,

the United States shall provide written notice to Defendants and the trustee, if there is one,

stating whether or not it objects to the proposed divestitures.  If the United States provides

written notice that it does not object, the divestitures may be consummated, subject only to

Defendants' limited right to object to the sale under Section V(C) of this Final Judgment.  Absent

written notice that the United States does not object to the proposed Acquirer(s) or upon

objection by the United States, a divestiture proposed under Section IV or Section V shall not be

consummated.  Upon objection by Defendants under Section V(C), a divestiture proposed under

Section V shall not be consummated unless approved by the Court.

## VIII.  Financing

Defendants shall not finance all or any part of any purchase made pursuant to Section IV

or V of this Final Judgment.

## IX.  Hold Separate

Until the divestitures required by this Final Judgment have been accomplished,

Defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order

entered by this Court.  Defendants shall take no action that would jeopardize the divestitures

ordered by this Court.

-12-

## X. **Affidavits**

A.       Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestitures have been completed under Sections IV or V, Defendants shall deliver to the United States an affidavit as to the fact and manner of its compliance with Section IV or V of this Final Judgment.  Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Theatre Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts Defendants have taken to solicit buyers for the Theatre Assets, and to provide required information to prospective purchasers, including the limitations, if any, on such information.  Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by defendants, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.       Within twenty (20) calendar days of the filing of the Complaint in this matter, defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section IX of this Final Judgment.  Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

-13-

C.      Defendants shall keep all records of all efforts made to preserve and divest the

Theatre Assets until one year after such divestitures have been completed.

## XI.  Compliance Inspection

A.      For the purposes of determining or securing compliance with this Final Judgment,

or of determining whether the Final Judgment should be modified or vacated, and subject to any

legally recognized privilege, from time to time duly authorized representatives of the United

States Department of Justice, including consultants and other persons retained by the United

States, shall, upon written request of an authorized representative of the Assistant Attorney

General in charge of the Antitrust Division, and on reasonable notice to defendants, be permitted:

    (1)    access during defendants' office hours to inspect and copy, or at the option
of the United States, to require defendants to provide hard hard copy or
electronic copies of, all books, ledgers, accounts, records, data, and
documents in the possession, custody, or control of defendants, relating to
any matters contained in this Final Judgment; and

    (2)    to interview, either informally or on the record, defendants' officers,
employees, or agents, who may have their individual counsel present,
regarding such matters.  The interviews shall be subject to the reasonable
convenience of the interviewee and without restraint or interference by
defendants.

B.      Upon the written request of an authorized representative of the Assistant Attorney

General in charge of the Antitrust Division, defendants shall submit written reports or response

to written interrogatories, under oath if requested, relating to any of the matters contained in this

Final Judgment as may be requested.

C.      No information or documents obtained by the means provided in this section shall

be divulged by the United States, to any person other than an authorized representative of the

executive branch of the United States, except in the course of legal proceedings to which the

United States is a party (including grand jury proceedings), or for the purpose of securing

compliance with this Final Judgment, or as otherwise required by law.

D.      If at the time information or documents are furnished by defendants to the United

States, defendants represent and identify in writing the material in any such information or

documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal

Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to

claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United

States shall give defendants ten (10) calendar days notice prior to divulging such material in any

legal proceeding (other than a grand jury proceeding).

## XII.  Notification

Unless such transaction is otherwise subject to the reporting and waiting period

requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15

U.S.C. § 18a (the "HSR Act"), defendants, without providing advance notification to the

Department of Justice, shall not directly or indirectly acquire any assets of or any interest,

including any financial, security, loan, equity or management interest, in the business of first-run,

commercial theatres in Mecklenburg County, North Carolina; Wake County, North Carolina; and

Buncombe County, North Carolina during a ten year period.  This notification requirement shall

apply only to the acquisition of any assets or any interest in the business of first-run, commercial

motion picture theatres at the time of the acquisition and shall not be construed to require

notification of acquisition of interest in new theatre developments or of assets not being operated

as first-run commercial motion picture theatre businesses, provided, that this notification

requirement shall apply to first-run, commercial theatres under construction at the time of the entering of this Final Judgment.

Such notification shall be provided to the Department of Justice in the same format as, and per the instructions relating to the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended, except that the information requested in Items 5 through 9 of the instructions must be provided only about first-run, commercial theatres. Notification shall be provided at least thirty (30) calendar days prior to acquiring any such interest, and shall include, beyond what may be required by the applicable instructions, the names of the principal representatives of the parties to the agreement who negotiated the agreement, and any management or strategic plans discussing the proposed transaction. If within the 30-day period after notification, representatives of the Antitrust Division make a written request for additional information, defendants shall not consummate the proposed transaction or agreement until thirty (30) days after submitting all such additional information. Early termination of the waiting periods in this paragraph may be requested and, where appropriate, granted in the same manner as is applicable under the requirements and provisions of the HSR Act and rules promulgated thereunder. This Section shall be broadly construed and any ambiguity or uncertainty regarding the filing of notice under this Section shall be resolved in favor of filing notice.

### XIII. <u>No Reacquisition</u>

Defendants may not reacquire any part of the theatre assets divested under this Final Judgment during the term of this Final Judgment.

## XIV.  <u>Retention of Jurisdiction</u>

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XV.  <u>Expiration of Final Judgment</u>

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

## XVI.  <u>Public Interest Determination</u>

Entry of this Final Judgment is in the public interest.  The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States's responses to comments.  Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

**Date:**  _____

Court approval subject to procedures
of Antitrust Procedures and Penalties
Act, 15 U.S.C. § 16

_____

**United States District Judge**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Civil Action No. |
| v. | ) | |
| | ) | Judge |
| | ) | |
| REGAL CINEMAS, INC., | ) | Filed: |
| | ) | |
| and | ) | |
| | ) | |
| CONSOLIDATED THEATRES HOLDINGS, GP, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |
| | ) | |

## UNITED STATES' EXPLANATION OF CONSENT DECREE PROCEDURES

The United States submits this short memorandum summarizing the procedures regarding the Court's entry of the proposed Final Judgment. This Judgment would settle this case pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) (the "APPA"), which applies to civil antitrust cases brought and settled by the United States.

1.     Today, the United States has filed a Complaint, a proposed Final Judgment, and a Hold Separate Stipulation and Order between the parties by which they have agreed that the Court may enter the proposed Final Judgment after the United States has complied with the

1

APPA.  The United States has  also  filed a Competitive Impact Statement relating to the proposed Final Judgment.

2.      The APPA requires that the United States publish the proposed Final Judgment and the Competitive Impact Statement in the Federal Register and in certain newspapers at least sixty (60) days prior to entry of the proposed Final Judgment.  The notice will inform members of the public that they may submit comments about the proposed Final Judgment to the United States Department of Justice, Antitrust Division, 15 U.S.C. § 16(b)-(c).

3.      During the sixty-day period, the United States will consider, and at the close of that period respond to, any comments that it has received, and it will publish the comments and the United States' responses in the Federal Register.

4.      After the expiration of the sixty-day period, the United States will file with the Court the comments and the United States' responses, and it may ask the Court to enter the proposed Final Judgment (unless the United States has decided to withdraw its consent to entry of the Final Judgment, as permitted by Paragraph 2 of the Stipulation, *see* 15 U.S.C. § 16(d)).

5.      If the United States requests that the Court enter the proposed Final Judgment after compliance with the APPA, 15 U.S.C. § 16(e)-(f), then the Court may enter the Final Judgment without a hearing, provided that it concludes that the Final Judgment is in the public interest.

Dated: April 29, 2008

Respectfully submitted,

*Gregg Malawer*

Gregg I. Malawer (DC Bar No. 481685)
Trial Attorney, Litigation III
U.S. Department of Justice
Antitrust Division
450 5th St. NW, Suite 4000
Washington, DC 20530
Tel: (202) 514-0230