UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) Civil Action No: 1:08-cv-00746 |
| v. | ) |
| | ) Judge: Leon, Richard J. |
| | ) |
| REGAL CINEMAS, INC., | ) Filed: April 30, 2008 |
| | ) |
| and | ) |
| | ) |
| CONSOLIDATED THEATRES HOLDINGS, GP, | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## COMPETITIVE IMPACT STATEMENT

Plaintiff, the United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C.§16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

## I.  NATURE AND PURPOSE OF THE PROCEEDING

On January 14, 2008, Defendant Regal Cinemas, Inc. ("Regal") agreed to acquire Defendant Consolidated Theatres Holdings, GP ("Consolidated") for approximately $210 million.  The United States filed a civil antitrust complaint on April 29, 2008, seeking to enjoin the proposed acquisition and to obtain equitable relief.  The Complaint alleges that the acquisition, if permitted to proceed, would combine the two leading, and in some cases, only

1

operators of first-run, commercial movie theatres in parts of the metropolitan areas of Charlotte, Raleigh, and Asheville, North Carolina. The likely effect of this acquisition would be to lessen competition substantially for first-run commercial motion picture exhibition in violation of Section 7 of the Clayton Act, 15 U.S.C. §18.

At the same time the Complaint was filed, the United States also filed a Hold Separate Stipulation and Order ("Hold Separate") and proposed Final Judgment, which are designed to eliminate the anticompetitive effects of the acquisition. Under the proposed Final Judgment, which is explained more fully below, Regal and Consolidated are required to divest four theatres located in Charlotte, Raleigh and Asheville to acquirers acceptable to the United States.

Under the terms of the Hold Separate, Defendants will take certain steps to ensure that four theatres to be divested will be maintained and operated as economically viable and ongoing business concerns.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

II.    **DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION**

   A. **The Defendants and the Proposed Transaction**

Regal, a Tennessee corporation, is currently the nation's largest movie theatre operator. Regal operates more than 6,400 screens at approximately 540 theatres in 39 states and the District of Columbia under the Regal, United Artists, Edwards, and Hoyts names, with revenues of approximately $2.6 billion in 2007.

Consolidated, a North Carolina partnership, operates 400 screens at 28 theatres in Georgia, Maryland, North Carolina, South Carolina, Tennessee, and Virginia, with additional theatres projected to open in the next few years, including the Biltmore Grande 15 in Asheville, which will open about August 2008. For fiscal year 2007, Consolidated generated revenues of approximately $144 million.

On January 14, 2008, Regal and Consolidated signed a purchase and sale agreement. The deal is structured as an asset purchase, with Regal acquiring Consolidated for approximately $210 million.

   B. **The Competitive Effects of the Transaction on the Exhibition of First-Run, Commercial Movies**

The Complaint alleges that the theatrical exhibition of first-run, commercial films in each of Southern Charlotte, Northern and Southern Raleigh, and Asheville, North Carolina constitutes a line of commerce and a relevant market for antitrust purposes.

   *1.   The Relevant Product and Geographic Markets*

The Complaint alleges that the relevant product market within which to assess the competitive effects of this merger is the exhibition of first-run, commercial movies. According

3

to the Complaint, the experience of viewing a film in a theatre is an inherently different experience from other forms of entertainment, such as a live show, a sporting event, or viewing a movie in the home (*e.g.*, on a DVD or via pay-per-view). Reflecting the significant differences of viewing a movie in a theatre, ticket prices for movies are generally very different from prices for other forms of entertainment: live entertainment is typically significantly more expensive than a movie ticket, whereas renting a DVD for home viewing is usually significantly cheaper than viewing a movie in a theatre. The Complaint also alleges that a small but significant post-acquisition increase in ticket prices, or reduction in discounts, for first-run commercial movies would not cause a sufficient number of customers to shift to other forms of entertainment to make such a price increase unprofitable.

The Complaint alleges that moviegoers generally do not regard sub-run movies, art movies, or foreign language movies as an adequate substitute for first-run movies and would not switch to sub-run movies, art movies, or foreign language movies if the price of viewing first-run movies was increased by a small but significant amount. Although sub-run, art and foreign language movies appeal to some viewers of commercial movies, potential audience and demand conditions are quite distinct. Exhibitors consider sub-run, art, and foreign language theatre operations as distinct from the operations of theatres that exhibit commercial movies. A small but significant post-acquisition increase in ticket prices, or reduction in discounts, for first-run commercial movies would not cause a sufficient number of customers to switch to theatres exhibiting sub-run, art, or foreign language movies to make such a price increase unprofitable.

The Complaint alleges that the relevant geographic markets in which to measure the competitive effects of this merger are the parts of metropolitan areas identified as Southern Charlotte, Northern Raleigh, Southern Raleigh and Asheville. According to the Complaint, the

4

Southern Charlotte area encompasses Consolidated's Philips Place 10 theatre, Consolidated's Arboretum 12, Regal's Crown Point 12 and Regal's Stonecrest 22 theatre. In this area, the only other theatres showing first-run, commercial movies are an independent five-plex stadium theatre and the AMC Carolina Pavilion 22, a stadium theatre.

The Northern Raleigh area encompasses Regal's Brier Creek 14, Regal's North Hills 14, and Consolidated's Raleigh Grand. The only other theatres showing first-run, commercial movies in the Northern Raleigh area are the sloped-floor, six screen Six Forks and the 15-screen Carmike theatre with stadium seating.

The Southern Raleigh area consists of the suburb of Garner to the south of Raleigh and encompasses Regal's Garner Towne Square 10 and Consolidated's White Oak 14. There are no other theatres showing first-run, commercial movies in Southern Raleigh.

The Asheville area encompasses Regal's Hollywood 14 and the developing site of Consolidated's Biltmore Grande 15, which is scheduled to open in August of 2008. There are only two other non-Regal theatres showing first-run, commercial movies in Asheville -- a Carmike theatre with 10 screens and a Fine Arts theatre with two screens.

According to the Complaint, moviegoers who reside in each of these areas are reluctant to travel significant distances out of that area to attend a movie except in unusual circumstances and would not do so in sufficient numbers to make a small but significant price increase unprofitable. As a consequence, each of these areas is a relevant geographic market in which to assess the competitive effects of the merger.

### 2. Competitive Effects in the Relevant Markets

The Complaint alleges that companies that operate first-run, commercial movie theatres (known as exhibitors) compete on multiple dimensions. They compete over the quality of the

viewing experience. They compete to offer the most sophisticated sound systems, best picture

clarity, nicest seats with best views, and cleanest floors and lobbies for moviegoers. Exhibitors

also seek to license the first-run movies that are likely to attract the largest numbers of

moviegoers. Exhibitors also compete on price,[1] knowing that if they charge too much (or do not

offer sufficient discounted tickets for matinees, seniors, children, etc.), moviegoers will choose

to view movies at rival theatres.

 According to the Complaint, the proposed merger is likely to lead to higher ticket prices

for moviegoers in each of the relevant markets. The merger would also reduce the newly merged

entity's incentives to maintain, upgrade, and renovate its theatres in the relevant markets, to

improve its theatres' amenities and services, and to license the highest revenues movies, thus

reducing the quality of the viewing experience. The Complaint alleges these outcomes are likely

because, in each of the relevant markets, Regal and Consolidated are each other's most

significant competitor, given their close proximity to one another and to moviegoers.

 In Southern Charlotte, the proposed merger would give the newly merged entity control

of four of the six first-run, commercial theatres in that area, with 56 out of 83 total screens and a

75% share of 2007 box office revenues, which totaled approximately $17.1 million. Using a

measure of market concentration called the Herfindahl-Hirschman Index ("HHI"), explained in

Appendix A, the merger would yield a post-merger HHI of approximately 6058, representing an

increase of roughly 2535 points.

 In Northern Raleigh, the proposed merger would give the newly merged entity control of

---

[1] An example of such price competition occurred in 2006 in Southern Raleigh when Consolidated opened the White Oak 14, a stadium theatre. Regal's Towne Square theatre in Southern Raleigh is an older sloped-floor theatre located approximately five miles away. After the White Oak 14 opened, the Towne Square theatre decreased its adult admission price substantially.

three of the five first-run, commercial theatres in that area, with 44 of 65 total screens and 79% of 2007 box office revenues, which totaled approximately $11.6 million. The merger would yield a post-merger HHI of roughly 6523, representing an increase of around 2315 points.

In Southern Raleigh, the proposed merger would give the newly merged entity control of the only two theatres in this area. Therefore, the market share of the combined entity would be 100% of screens and 100% of 2007 box office revenues, which totaled $3.5 million. The merger would yield the highest post-merger HHI number possible, 10000, representing an increase of 3167 points.

In Asheville, after the completion of the Biltmore Grand 15, the proposed merger would give the newly merged entity control of four of the six first-run, commercial theatres with 41 of 53 total screens. As measured by total screens only (since Consolidated does not yet have box office revenues in Asheville), the combined entity would have a market share of approximately 77% in Asheville. The merger would yield a post-merger HHI of roughly 6355, representing an increase of 2777 points.

In each of these markets today, were Regal or Consolidated to increase ticket prices and the other were not to follow, the exhibitor that increased price would likely suffer financially as a substantial number of its patrons would patronize the other exhibitor's theatre. After the merger, the newly combined entity would re-capture such losses, making price increases profitable that would have been unprofitable pre-merger. Likewise, the proposed merger would also eliminate competition between Regal and Consolidated over the quality of the viewing experience at their theatres in each of the geographic markets at issue.

The Complaint explains that the presence of the other theatres offering first-run, commercial movies in certain of the relevant geographic markets would be insufficient to replace

7

the competition lost due to the merger, and thus render unprofitable post-merger increases in ticket prices or decreases in quality by the newly merged entity.  For various reasons, the other theatres in the relevant geographic markets offer less attractive options for the moviegoers that are served by the Regal and Consolidated theatres.  For example, they are located further away from these moviegoers than are the Regal and Consolidated theatres, they are a relatively smaller size or have fewer screens than the Regal and Consolidated theatres, or they offer a lower quality a viewing experience than do the Regal and Consolidated theatres.

Finally, the Complaint alleges that the entry of a first-run, commercial movie theatre in response to an increase in movie ticket prices or a decline in theatre quality is unlikely in all of the relevant markets.  Exhibitors are reluctant to locate new theatres near existing theatres unless the population density and demographics makes new entry viable or the existing theatres do not have stadium seating.  That is not the case in any of the relevant markets.  Over the next two years, the demand for more movie theatres in the areas at issue is not likely to support entry of a new theatre.  And all of these markets have or will soon have theatres with stadium seating.

For all of these reasons, the United States has concluded that the proposed transaction would lessen competition substantially in the exhibition of first-run, commercial films in Southern Charlotte, Northern and Southern Raleigh, and Asheville, eliminate actual and potential competition between Regal and Consolidated, and likely result in increased ticket prices and lower quality theatres in those markets.  The proposed merger therefore violates of Section 7 of the Clayton Act.

## III.    **EXPLANATION OF THE PROPOSED FINAL JUDGMENT**

The divestiture requirement of the proposed Final Judgment will eliminate the anticompetitive effects of the acquisitions in Southern Charlotte, Northern and Southern Raleigh,

and Asheville by establishing new, independent, and economically viable competitors. The proposed Final Judgment requires Regal and Consolidated, within ninety (90) calendar days after the filing of the Complaint, or five (5) days after the notice of the entry of the Final Judgment by the court, whichever is later, to divest, as viable ongoing businesses, a total of four theatres in three metropolitan areas: Crown Point 12 (Southern Charlotte); the Raleigh Grand 16 (Northern Raleigh); Town Square 10 (Southern Raleigh); and Hollywood 14 (Asheville). Sale of these theatres will thus preserve existing competition between the defendants' theatres that are or would have been each others' most significant competitor in the theatrical exhibition of first-run films in Southern Charlotte, Northern and Southern Raleigh, and Asheville. The assets must be divested in such a way as to satisfy the United States in its sole discretion that the theatres can and will be operated by the purchaser as viable, ongoing businesses that can compete effectively as first-run commercial theatres. Defendants must use their best efforts to accomplish the divestiture quickly and shall cooperate with prospective purchasers. Until the divestitures take place, Regal and Consolidated must maintain the sales and marketing of the theatres, and maintain the theatres in operable condition at current capacity configurations. Until the divestitures take place, Regal and Consolidated must not transfer or reassign to other areas within the company their employees with primary responsibility for the operation of the Theatre Assets, except for transfer bids initiated by employees pursuant to Defendants' regular, established job posting policy.

In the event that Defendants do not accomplish the divestitures within the periods prescribed in the proposed Final Judgment, the Final Judgment provides that the Court will appoint a trustee selected by the United States to effect the divestitures. If a trustee is appointed, the proposed Final Judgment provides that Regal and Consolidated will pay all costs and

9

expenses of the trustee. The trustee's commission will be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestitures are accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court and the United States, setting forth his or her efforts to accomplish the divestiture. At the end of six (6) months, if the divestitures have not been accomplished, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate, in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

If Defendants or trustee are not able to obtain a landlord's consent to sell one of the theatres to be divested, Section VI of the proposed Final Judgment permits Defendants to propose an alternative theatre to be divested. The United States shall determine whether the theatre offered competes effectively with the theatre that could not be divested due to a failure to obtain landlord consent. This provision will insure that any failure by Defendants to obtain landlord consent by Defendants does not thwart the relief obtained in the proposed Final Judgment.

The proposed Final Judgment also prohibits Defendants from acquiring any other theatres in Mecklenburg County, North Carolina; Wake County, North Carolina; and Buncombe County, North Carolina without providing at least thirty (30) days notice to the United States Department of Justice. Such acquisitions could raise competitive concerns but might be too small to be reported under the Hart-Scott-Rodino ("HSR") premerger notification statute.

## IV.    **REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS**

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to

recover three times the damages the person has suffered, as well as costs and reasonable attorney's fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

## V.    PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> John R. Read, Chief
> Antitrust Division/Litigation III
> United States Department of Justice
> 450 5th Street, N.W. Suite 4000
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the

parties may apply to the Court for any order necessary or appropriate for the modification,

interpretation, or enforcement of the Final Judgment.

## VI.     ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full

trial on the merits against Defendants. The United States could have continued the litigation and

sought preliminary and permanent injunctions against Regal's merger with Consolidated. The

United States is satisfied, however, that the divestiture of assets and other relief described in the

proposed Final Judgment will preserve competition for the exhibition of first-run, commercial

films in the relevant markets identified by the United States. Thus, the proposed Final Judgment

would achieve all or substantially all of the relief the United States would have obtained through

litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the

Complaint.

## VII.    STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED
       FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in

antitrust cases brought by the United States be subject to a sixty-day comment period, after

which the court shall determine whether entry of the proposed Final Judgment "is in the public

  
interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the

statute as amended in 2004, is required to consider:

(A)     the competitive impact of such judgment, including termination of alleged
        violations, provisions for enforcement and modification, duration of relief sought,
        anticipated effects of alternative remedies actually considered, whether its terms
        are ambiguous, and any other competitive considerations bearing upon the
        adequacy of such judgment that the court deems necessary to a determination of
        whether the consent judgment is in the public interest; and

(B)     the impact of entry of such judgment upon competition in the relevant market or
        markets, upon the public generally and individuals alleging specific injury from
        the violations set forth in the complaint including consideration of the public
        benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is

necessarily a limited one as the government is entitled to "broad discretion to settle with the

defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d

1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp.

2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act).[2]

As the United States Court of Appeals for the District of Columbia Circuit has held,

under the APPA a court considers, among other things, the relationship between the remedy

secured and the specific allegations set forth in the government's complaint, whether the decree

is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree

may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the

adequacy of the relief secured by the decree, a court may not "engage in an unrestricted

---

[2] The 2004 amendments substituted "shall" for "may" in directing relevant factors for
court to consider and amended the list of factors to focus on competitive considerations and to
address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15
U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns,* 489 F. Supp. 2d at 11 (concluding that the
2004 amendments "effected minimal changes" to Tunney Act review).

13

evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001).  Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General.  The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree.  The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is *"within the reaches of the public interest."*  More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[3]  In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

---

[3] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60. As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

15

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[4]

## VIII.    DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

---

[4] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

Dated: April 30, 2008

Respectfully submitted,

Gregg I. Malawer (DC Bar No. 481685)
Jennifer A. Wamsley (DC Bar No. 486540)
Anne Newton McFadden
U.S. Department of Justice Antitrust
Division 450 5th Street, N.W. Suite 4000
Washington, DC 20530
(202) 514-0230
Attorneys for Plaintiff the United States

17

# EXHIBIT A

## DEFINITION OF HHI AND

## CALCULATIONS FOR MARKET

"HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, for a market consisting of four firms with shares of thirty, thirty, twenty and twenty percent, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 =$ 2600).  The HHI takes into account the relative size and distribution of the firms in a market and approaches zero when a market consists of a large number of firms of relatively equal size.  The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated, and those in which the HHI is in excess of 1800 points are considered to be concentrated.  Transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the Merger Guidelines.  See *Merger Guidelines* 1.51.

18